**ASBURY UNIVERSITY, Appellant**

v.

**Deborah POWELL; Debra Doss; and Bryan Begley Daley, Appellees**

2014–SC–000095–DG

Supreme Court of Kentucky.

RENDERED: MARCH 17, 2016

COUNSEL FOR APPELLANT: Debra H. Dawahare, Leila Ghabrial O'Carra, Wyatt, Tarrant & Combs, LLP, 250 West Main Street, Suite 1600, Lexington, Kentucky 40507-1746

COUNSEL FOR APPELLEES: Debra Ann Doss, 108 Pasadena Drive, Suite 200, Lexington, Kentucky 40503-2967, Bryan Begley Daley, 2692 Richmond Road, Suite 204, Lexington, Kentucky 40509

OPINION OF THE COURT BY JUSTICE NOBLE

A Jessamine Circuit Court jury found that Asbury University's discharge of former women's basketball coach Deborah Powell was unlawful retaliation for her engaging in activity protected under the Kentucky Civil Rights Act. The Court of Appeals affirmed. In petitioning this Court for discretionary review, Asbury raised numerous claims of error, and we accepted review primarily to decide whether retaliation claims brought under KRS 344.280(1) must be predicated upon an underlying violation of the KCRA and to

clarify the causation standard required for such claims and how the jury should be instructed on that element. We answer these questions below, address Asbury's other allegations of error, and affirm.

## I. Background

Deborah Powell was hired by Asbury University (then Asbury College) in 2002 to coach its women's basketball team. She was initially employed part-time but accepted a full-time position a year later and was given additional responsibilities, including coordinating the school's intramural activities.

In August 2005, Powell submitted a formal grievance with then-Provost Ray Whiteman and then-President Paul Rader claiming that her superiors were discriminating against her on the basis of her gender. The grievance process was completed by October 2005. Thereafter, Provost Whiteman and President Rader each retired in 2006, and Asbury hired Dr. Sandra Gray as interim Provost and Dr. William Crothers as interim President to replace them. In 2007, it permanently hired Dr. Jon Kulaga as Provost and Dr. Gray as President.

Apparently, the resolution of the grievance process in late-2005 did not resolve Powell's concerns for what she perceived to be ongoing gender discrimination. Powell continued making oral complaints to Athletic Director (AD) Gary Kempf, which included: that the men's basketball team's media guide was prepared and released before its season started, while the women's was not released until mid-season; that she was prohibited from rolling over budgeted funds for team trips helpful for recruiting, which the men's basketball team was permitted to do; that the men's basketball coach was given preferential treatment in scheduling; that she was prohibited from restructuring her coaching and intramural duties—which often conflicted with her head-coaching duties and caused her to work excessive hours—to align more equitably with the male coaches' duties; and that she was wrongfully denied access, as the school's only female head coach, to an outside auditor hired to evaluate the athletic department.

Powell also introduced evidence of acknowledgment by the university of at least some of the perceived gender inequality, including that AD Kempf had noted that "boys will be boys" in response to complaints that male coaches responsible for assisting her with intramural activities were not doing so during their teams' seasons. Her complaints continued through January 2008.

On February 8, 2008, AD Kempf advised Powell of complaints of alleged misconduct between her and assistant coach Heather Hadlock during a February 7 team bus trip to Berea.

Specifically, a few team members complained that they saw inappropriate physical touching of a type ordinarily reserved for intimate or romantic relationships between Powell and Hadlock. Powell countered that Hadlock had been upset and crying, and Powell had held her hand in prayer and patted her arm to console her. Kempf also advised Powell of additional allegations of inappropriate conduct with Hadlock, including an alleged September 2007 incident involving the side of Powell's leg touching Hadlock's during a prayer session with a player, and another incident where Powell reportedly put her arm around Hadlock's shoulders when they were visiting a player in the hospital. Powell denied any inappropriate conduct, explaining that any instances of touching were either incidental or prayer-related. Instead, she believed the players who had voiced the complaints were upset with her

about team-related decisions she had made.

On February 11, 2008, Powell received an email from Provost Kulaga advising her that she had been placed on administrative leave, was barred from entering campus, and would not be permitted to speak with her players despite her requests to do so. Powell's first opportunity to speak directly with Provost Kulaga was February 18, when she again denied any misconduct, provided innocent explanations for her conduct, and requested an opportunity to speak with her team to explain her innocent behavior and work toward reconciliation, which was again rebuffed. On February 29, following his investigation, Provost Kulaga told Powell that all of her players viewed her behavior with Hadlock as inappropriate; that none of them wanted her to be their coach; that she was being permanently removed from all of her duties with Asbury; and that she was barred from contacting any of the players.

At trial, Powell introduced evidence from one of her former players that contradicted the factual conclusions Provost Kulaga had reached and given as reasons for ending her employment. Powell also introduced evidence that the provost had failed to comply with Asbury's policies and procedures for such investigations, had ignored the advice and input of the university's Human Resources Director Glenn Hamilton during the investigation, and had destroyed his investigative notes and emails after concluding the investigation.

Hamilton also testified that Powell had been treated differently than any other coach by being prohibited from speaking with her team or attending games or practices, by being locked out of her office, and by being barred from entering campus. There was also evidence that Provost Kulaga, the final decision-maker regarding

Powell's employment, was advised of and discussed with Kempf and others her prior gender-discrimination complaints shortly before making the decision to terminate her employment.

In her suit against the university, Powell asserted claims of defamation, gender discrimination under KRS 344.040, and retaliation under KRS 344.280(1). After a four-day trial, the jury returned a verdict in Asbury's favor on the defamation and discrimination claims but in Powell's favor on the retaliation claim. The jury awarded her damages of $88,325.97 for lost wages and benefits plus $300,000 for humiliation, embarrassment, and emotional distress. Following post-trial motions, the trial court entered a supplemental judgment denying Asbury's motions for judgment notwithstanding the verdict and for a new trial and awarding Powell attorneys' fees and costs as allowed by KRS 344.450.

Asbury appealed to the Court of Appeals, which affirmed. This Court then granted Asbury's petition for discretionary review, and for the reasons explained below, we also affirm.

## II. Analysis

**A. Claiming retaliation under KRS 344.280(1) does not require an underlying violation of the KCRA.**

The first issue on review is whether a claim of unlawful employer retaliation under KRS 344.280(1) must arise from an actual underlying violation of the KCRA to be valid. Asbury contends that because it was not found to have committed an underlying act of gender discrimination, Powell's retaliation claim fails as a matter of law.

To prove unlawful employer retaliation, an aggrieved employee must prove only that her employer retaliated or discriminated against her "because [s]he has op-

posed a practice declared unlawful by [the KCRA], or ... made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [the KCRA]." KRS 344.280(1).

While the jury ultimately found that Asbury had not engaged in gender discrimination in violation of the Act, Powell's retaliation claim was not premised upon that alleged discrimination. Rather, her retaliation claim was based on Asbury's retaliating in response to her complaints about the perceived gender discrimination.

▪ Powell argues that it is the act of complaining about an alleged violation of the KCRA, and not the violation itself, coupled with a subsequent act by the employer adverse to the employee, that forms the basis for a claim of retaliation. This is in accord with federal courts' interpretation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579–80 (6th Cir. 2000) ("[A] violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful."); cf. Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53, 69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("[T]he standard [for proving retaliation] is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint."). Thus, an underlying violation of the KCRA need not necessarily be proved to sustain a retaliation claim under KRS 344.280(1).

Instead, as under the federal rule, all that is required to obtain retaliation protection under KRS 344.280(1) is that the employee have "a reasonable and good

faith belief" that the adverse employment practices she opposed were KCRA violations. Wasek v. Arrow Energy Services, Inc., 682 F.3d 463, 469 (6th Cir. 2012) (quoting Johnson, 215 F.3d at 579).

▪ And whether that belief is reasonable or in good faith is a question for the jury. Consequently, a jury could believe that the alleged discriminatory conduct of the employer was not in fact discriminatory, but that it could have reasonably appeared so to the employee. That is the upshot of the jury's finding here. A retaliation claim is premised on the notion that the employer takes adverse action against an employee because the employee exercised the right to speak out against discrimination.

The retaliation instruction given in this case required the jury to find that Powell made her complaints of discrimination out of a reasonable and good faith belief. But perhaps more telling to this point, Asbury effectively conceded in its brief that Powell's opposition to its alleged discriminatory practices met that standard.

Consequently, given that a retaliation claim is based on making the claim rather than whether the jury believed the claim, we hold that Powell's retaliation claim does not fail because Asbury was not found to have discriminated in the direct discrimination claim.

**B. KRS 344.280(1) requires but-for causation.**

Next, Asbury claims that because this Court has consistently interpreted the KCRA in accord with federal courts' interpretations of its corollary provisions in Title VII, state claims of retaliation under KRS 344.280(1) must require proof of but-for causation.[1] In support, Asbury cites

---

1. The "but for" rule, which is a common law rule for determining legal causation "may be stated as follows: The defendant's conduct is

a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of

*University of Texas Southwestern Medical Center v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). Asbury further argues that under that standard, Powell's claim must fail as a matter of law. We discuss these two claims separately below.

**1. The jury instructions should have directed the jury to determine only whether retaliatory motive was a "but for" cause of the adverse employment action, but instructing the jury to find both that it was a substantial-and-motivating factor and a but-for cause was not prejudicial error.**

Both parties premise their arguments as to which causation standard KRS 344.280(1) requires on the well-accepted notion that this Court, when interpreting the KCRA, tends to follow federal interpretations of Title VII because the state Act is generally considered to operate the same as its federal counterpart. *See Brooks v. Lexington–Fayette Urban Cty. Hous. Auth.,* 132 S.W.3d 790, 802 (Ky. 2004); *see also* KRS 344.020(a) (providing that one of the general purposes of the KCRA is "[t]o provide for execution within the state of the policies embodied in [Title VII of] the Federal Civil Rights Act of 1964 [and other federal statutes]"). The parties differ, however, as to how this general proposition should operate here, where each offers a different United States Supreme Court decision as controlling. They fail to address that this Court nonetheless follows state law relating to evidentiary burdens and procedure.

Asbury urges this Court to hold that *Nassar* controls because it provides the Supreme Court's definitive interpretation of the causation requirement in federal retaliation claims. Because the Supreme Court in *Nassar* said Title VII requires an employee to establish but-for causation to claim unlawful retaliation, Asbury argues, we need only apply that interpretation to the KCRA's anti-retaliation provision, KRS 344.280(1), and hold that provision also contains a but-for-causation requirement. Asbury claims that the jury instructions misstated the causation element for finding unlawful retaliation because they included an alternative standard, "substantial factor."

Powell counters that the evidentiary framework for establishing causation laid out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and subsequent decisions of this Court discussing and purportedly applying at least parts of it to the KCRA,[2] should instead continue to govern state retaliation claims under KRS 344.280(1) because the Kentucky General Assembly never amended the KCRA after *Price Waterhouse,* whereas the federal act had changed. Powell contends that the General Assembly's inaction shows that it intended *Price Waterhouse's* interpretation to continue to apply to all KCRA claims, including claims of retaliation. She points out that Congress amended Title VII after *Price Waterhouse,* but only as to discrimination claims and not to retaliation claims, and it was that decision not to amend Title VII's retaliation provisions that prompted the decision in *Nassar.*

the event, if the event would have occurred without it." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* 266 (5th ed. 1984).

**2.** *See Meyers v. Chapman Printing Co.,* 840 S.W.2d 814, 823 (Ky. 1992) (adopting substantial-or-motivating-factor standard); *cf. First Prop. Mgmt. Corp. v. Zarebidaki,* 867 S.W.2d 185, 188 (Ky. 1993) (applying *Meyers* and *Price Waterhouse* to anti-retaliation provision of Workers' Compensation Act).

▮ This Court agrees with Asbury that the appropriate standard to determine whether retaliation has occurred because a discrimination claim was made is whether the retaliatory conduct would have occurred "but for" the employee engaging in protected complaints of discrimination, as set forth in *Nassar.* To explain our conclusion, it is necessary to first review *Price Waterhouse* and *Nassar*, and then place their holdings in context with Kentucky case law.

In *Price Waterhouse*, the United States Supreme Court was tasked with interpreting the language of the status-discrimination provision of Title VII, 42 U.S.C. § 2000e–2(a),[3] to decide what causation standard was required for federal employment discrimination claims. In so doing, a majority of the Supreme Court, albeit in a plurality opinion and two concurring opinions, construed the "because of" language of § 2000e–2(a) to require a plaintiff to show only that one of the prohibited traits (e.g., race, sex, etc.) was a "motivating" or "substantial" factor in the employer's adverse decision. 490 U.S. at 258, 109 S.Ct. 1775 (plurality opinion); *id.* at 259, 109 S.Ct. 1775 (White, J., concurring); *id.* at 276, 109 S.Ct. 1775 (O'Connor, J., concurring). The Court further held that once a plaintiff made such a showing, the burden of persuasion would shift to the employer to prove that it would have made the same decision in the absence of all discriminatory animus—i.e., that discrimination was not a but-for cause of the challenged decision. *Id.* at 258, 109 S.Ct. 1775 (plurality opinion); *id.* at 259–60, 109 S.Ct. 1775 (White, J., concurring); *id.* at 276–77, 109 S.Ct. 1775 (O'Connor, J., concurring).

Guided by Title VII's overarching purposes of safeguarding both employees' rights and employers' decision-making prerogatives, *Price Waterhouse* held that the proper balance was struck by requiring plaintiffs in "mixed motive" cases to prove only that a protected status was a substantial and motivating factor in the adverse decision, and requiring the employer to then prove that it would have made the same decision even in the absence of the illegitimate factor (i.e., negating but-for causation). *See id.* at 239, 109 S.Ct. 1775 (plurality opinion) ("Title VII eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice.").

Two years after *Price Waterhouse*, Congress amended Title VII to expressly codify the first prong of *Price Waterhouse's* framework, a lessened "motivating factor" causation standard, for claims of status-based discrimination. *See* Civil Rights Act of 1991, 105 Stat. 1071, Tit. I, § 107(a) (codified at 42 U.S.C. § 2000e–2(m)). But Congress did not amend the section relating to retaliation claims.

This is important primarily because the decision to codify *Price Waterhouse's* lessened causation standard only for claims of status-based discrimination, and not retaliation, was a central part of the Supreme Court's departure from *Price Waterhouse* more than two decades later in *Nassar.* That is, the *Nassar* majority declined to extend *Price Waterhouse's* holding and rationale to Title VII retaliation claims based in part on that decision by Congress. *See Nassar*, 133 S.Ct. at 2529. In finding that the 1991 amendments to Title VII demonstrated an affirmative intent on the part of Congress that the motivating-factor standard apply only to status-based claims (and not retaliation claims), the Supreme Court held that "Title VII retaliation

---

**3.** Section 2000e–2(a), among other things, makes it an "unlawful employment practice for an employer ... to discriminate against any individual ... *because of* such individual's race, color, religion, sex, or national origin." § 2000e–2(a)(1) (emphasis added).

claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 2528 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)).

And that is exactly what the instruction is this case required. Relevant to the causation element of Powell's retaliation claim, the trial court instructed the jury as follows:

> To prevail on her claim of retaliation, Deborah Powell must prove that:
>
> . . . .
>
> 5. [Her] complaining about gender discrimination was a substantial and motivating factor in the adverse employment action; *and*
>
> 6. But for her complaining about gender discrimination, she would not have suffered the adverse employment action.

(Emphasis added.)

Thus, the instruction placed the entire burden of proof on the plaintiff to prove retaliation. In drafting the instruction as written however, the trial court also complied with the mandate of this Court in *First Property Management v. Zarebidaki*, 867 S.W.2d 185, 188 (Ky. 1994), by including the "substantial and motivating factor" language.

In *Zarebidaki*, the plaintiff objected to an instruction that used the literal "because" language of the statute: "Do you believe from the evidence that the Plaintiff . . . was discharged because he intended to file and pursue a worker's compensation claim?"

In reviewing this instruction, this Court referenced an earlier case, *Meyers v. Chapman Printing Company*, 840 S.W.2d 814 (Ky. 1992), which looked at an instruction that used "but for" language. In both *Meyers* and *Zarebidaki*, this Court found

the instruction to be appropriate as given despite an argument that *Price Waterhouse* required a burden-shifting analysis. The *Zarebidaki* Court agreed with the *Meyers* court that

> [t]he 'but for' test does not require that the jury find sex discrimination was the exclusive motive for the employee's discharge, but only that it was an essential ingredient. In a civil action seeking damages for a discharge motivated by sex discrimination, a 'but for' test is a fair interpretation of the substantial factor standard.

*Zarebidaki*, 867 S.W.2d at 188. Explaining further, this Court then stated:

> But cases under the Kentucky Civil Rights Act are claims at law in Kentucky. In such cases, the burden of coming forward with evidence may shift, while the burden of persuasion remains with the plaintiff, and we must fashion an instruction suited to the task.

*Id.*

Having thus explained that under Kentucky law the burden of persuasion is always on the plaintiff, the Court noted that *the instructions* to the jury must simply allow the jury to form a belief that "the impermissible reason did in fact contribute to the discharge as one of the substantial motivating factors." *Id.* From there, the Court instructed that going forward, an instruction should state that the conduct must be "a substantial and motivating factor but for which the employee would not have been discharged." *Id.*

Despite the additional language, the *Zarebidaki* Court found no fault with the instruction as given because " 'but for' does not translate to 'solely because of,' " and for that reason "because of" does not either. *Id.* at 187.

Thus, in fact, Kentucky has *never* required an instruction that does not place

the burden of proof on the plaintiff or one that would specifically instruct on burden-shifting. Indeed, as the Court explained in *Meyers*, the *Price Waterhouse* case was not a jury trial, and as such would not necessarily be an authority on how juries should be instructed.

■ In Kentucky, it is axiomatic that "bare bones" instructions are given to the jury, and as the *Meyers* Court also noted, *the burden of going forward* may not be met, and a directed verdict could occur if the plaintiff does not present sufficient evidence to submit the question to the jury of whether her conduct was a substantial and motivating factor to the adverse employment action. Jury instructions, however, "should be framed only to state what the jury must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof." *Meyers*, 840 S.W.2d at 824. The *Meyers* Court concluded, "Thus as the trial court properly decided, under Kentucky procedure the 'but for' phrase used to express the causation issue was adequate." *Id.*

Thus, the instruction in this case perfectly mirrors Kentucky law, and by happenstance the standard set forth in *Nassar* as well. Indeed, it appears the *Nassar* Court merely restated the law as it has always been interpreted in Kentucky. Our case law requires "but for" causation instructions, just as *Nassar* does.

The instruction in this case ultimately required Powell to prove that "but for" her complaints she would not have suffered the adverse employment action. Thus, as instructed, the jury made its finding under the standard set forth in *Nassar* and long-standing Kentucky law.

Consequently, it is not simply a matter of saying whether *Price Waterhouse* or *Nassar* serves as precedent for the causation standard in Kentucky. Though both *Meyers* and *Zarebidaki* reference *Price Waterhouse*, neither actually follows its mandates. Instead, the mandate in our courts, which we are free to choose, is that since the ultimate burden of persuasion is on the plaintiff, "but for" causation suffices, for all the reasons stated in *Meyers* and *Zarebidaki*.

However, one question remains in this review taken over twenty years after the holding in *Zarebidaki*: If the ultimate question is answered by a "but for" analysis, which the plaintiff must prove to prevail, that is, that the adverse employment action would not have occurred but for her protected conduct, is it really necessary that a plaintiff also have to prove that her conduct was a "substantial and motivating factor"?

The simple answer is that if the adverse action would not have occurred but for her protected conduct, she has more than shown that such was a substantial and motivating factor for the adverse action. To that extent, this language is surplusage. In finding or not finding "but for" causation, the jury has necessarily found or not found that the plaintiffs conduct was a substantial factor in the adverse employment action.

■ Consequently, while we reiterate our prior decisions in Saying that the appropriate causation standard in retaliation cases is "but for" causation, we hold that the "substantial and motivating factor" is surplusage and should *not* be included in the jury instruction. Here, the instruction used the conjunctive "and" to also require a finding that the discrimination would not have occurred but for Powell's protected conduct. Fortunately for Powell, the jury found under the instruction that the adverse action would not have occurred absent her protected conduct. And unfortunately for Asbury, the jury found that but for her protected conduct, Asbury would

not have taken the adverse employment action.

Thus, while we agree with Asbury that the appropriate standard in an instruction in a retaliation case must require a plaintiff to prove that the adverse action would not have happened but for her protected conduct, the jury made precisely the finding Asbury is seeking.·

**2. There was sufficient evidence to find unlawful retaliation.**

Asbury also claims that Powell's retaliation claim should have failed, as a matter of law, because the evidence did not demonstrate the required causal connection, which of course the preceding discussion made clear is but-for causation. Despite the requirement to do so in the rule governing appellate briefs, Civil Rule 76.12,[4] neither party addressed whether this claim of error was even preserved for appellate review or, if it was, where in the record such preservation might be located—i.e., whether Asbury properly moved for a directed verdict and judgment notwithstanding the verdict on these grounds in the trial court below.

This Court could treat this as a procedural default, but a review of the record confirmed that, at the close of Powell's proof, Asbury did move for a directed verdict on the retaliation claim, arguing that Powell failed to prove that the termination of her employment was causally linked to her engaging in protected conduct—which Asbury maintains only includes her formal, written complaint in 2005 and not the informal, oral complaints to her superiors that continued over the years until her employment with the school ended. The record also shows that Asbury renewed its motion at the end of all the proof, and that

it again raised its insufficiency-of-the-evidence claim in its motion for judgment notwithstanding the verdict. The trial court ruled against Asbury on each occasion. Because the appropriate procedural steps were taken below, we will address this issue.

■■■ A trial court may grant a directed verdict only if the evidence is insufficient to sustain a verdict. *Garcia v. Whitaker*, 400 S.W.3d 270, 274 (Ky. 2013). It cannot direct a verdict "unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18–19 (Ky. 1998). "A motion for directed verdict admits the truth of all evidence which is favorable to the party against whom the motion is made." *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988).

■■■ And in ruling on the motion, "the trial court must 'draw all fair and rational inferences from the evidence in favor of the party opposing the motion.'" *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 64 (Ky. 1996) (quoting *Spivey v. Sheeler*, 514 S.W.2d 667, 673 (Ky. 1974)). Whenever there is conflicting proof, the court must reserve to the jury the determination and resolution of such conflicts. *Bierman*, 967 S.W.2d at 19. And the judge may not consider the credibility or weight of the evidence, the evaluation of which being solely a function of the fact-finding jury. *Cochran v. Downing*, 247 S.W.2d 228, 229–230 (Ky. 1952).

■■■ With those standards in mind, we conclude that the trial judge did not err in denying the directed-verdict motion. To survive a motion for a directed verdict on a

---

**4.** That rule provides, in relevant part, that each brief "shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." CR 76.12(4)(c)(v).

claim of retaliation under KRS 344.280(1), a plaintiff must produce evidence that (1) she engaged in protected activity (2) that was known to the defendant (3) who thereafter took an employment action adverse to the plaintiff, (4) which was causally connected to the plaintiffs protected activity. *See Brooks v. Lexington–Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004). Asbury raises issue with the fourth prong, claiming that Powell failed to prove a causal connection between her protected activity and the challenged employment action, and to a lesser extent, the second prong, arguing that her oral complaints to AD Kempf were not protected.

Because differing evidence was introduced on the question of causation, it was necessarily the responsibility of the jury to resolve the contested factual issues based on its assessment of the credibility and weight of that evidence.

Here, no one disputes the absence of direct evidence causally connecting Powell's complaints to the challenged employment action by Asbury. As such, this case is no different than the vast majority of retaliation cases where "smoking gun" evidence, such as written or oral declarations by the decision-maker, does not exist. Thus, Powell had to establish causation with circumstantial proof. *Ky. Dept. of Corrections v. McCullough*, 123 S.W.3d 130, 135 (Ky. 2003).

As this Court has noted, circumstantial evidence of causation is "evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Id.* (alteration in original) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 565 (6th Cir. 2000)). "In most cases, this requires proof that (1) the decision-maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close

temporal relationship between the protected activity and the adverse action." *Id.* (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). In addition, proof that the plaintiff was treated differently than other employees after engaging in protected activity may further support an inference of causation. *Id.*

Asbury argues that the only protected activity engaged in by Powell was her written complaint, which was filed and resolved in 2005. Asbury contends that this cannot form the basis of her retaliation claim because the challenged decision to end her employment occurred three years later, after Asbury had changed its decision-making personnel twice. Certainly, the 2005 written complaint, standing alone, would be insufficient to support a claim of retaliation for the 2008 discharge given the lack of any temporal proximity between the written complaint and her termination.

But Asbury's argument misconstrues the significance of Powell's repeated oral complaints to her superior and others throughout the intervening years. *Cf. Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) (stating that "complaining about allegedly unlawful conduct to company management is classic opposition activity" to sustain Title VII retaliation claim despite employee having never filed formal complaint with EEOC); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) ("The [EEOC] has identified a number of examples of 'opposing' conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices. . . .").

And we find unpersuasive Asbury's argument that Powell's oral complaints to AD Kempf were merely "petty workplace

gripes" that were unrelated to the terms of her employment and thus not protected activities under the KCRA. Powell's complaining encompassed what she perceived to be sex-based discrepancies in the terms and conditions of her employment by the school's athletic department as a head coach and intramural sports coordinator vis-à-vis her male counterparts. Therefore, her complaints involved alleged sex-based employment discrimination made unlawful by KRS 344.040(a)[5] and, as such, were protected activities under KRS 344.280(1).

 As the trial court and Court of Appeals both found, Powell put forth evidence sufficient for the jury to believe that Asbury had ended Powell's employment because she had complained about what she viewed as disparate treatment of her and the women's basketball team on the basis of sex. The few weeks that passed between Powell's final gender-based complaints in January 2008 and the beginning of the adverse employment actions (including first barring her from practice or contact with her players on February 8 and placing her on official administrative leave on February 11, through the ultimate decision to end her employment on February 29), is a sufficiently short period to establish temporal proximity in making an indirect showing of causation. *See Kwan v. Andalex Group LLC,* 737 F.3d 834, 845 (2d Cir. 2013) (approving three-week period). This, along with evidence demonstrating that only days before the decision was made to end Powell's employment, Kempf and Kulaga had discussed Powell's history of complaining about sex-based disparate treatment and past threats to seek legal

recourse if left unaddressed, was sufficient to satisfy her burden of producing evidence of "a causal connection between the activity engaged in and the [defendant] employer's act." *McCullough,* 123 S.W.3d at 134 (alteration in original) (quoting *Ky. Ctr. for the Arts v. Handley,* 827 S.W.2d 697, 701 (Ky.App.1991)).

Asbury is also incorrect in asserting that it was entitled to judgment in its favor on the retaliation claim because it produced evidence of a legitimate, non-retaliatory purpose for ending Powell's employment. Once Powell established a *prima facie* case of retaliation as explained above, the burden of production shifted to Asbury to show a non-retaliatory reason for the challenged decision. *McCullough,* 123 S.W.3d at 134. After it produced evidence of a non-retaliatory basis for the action, it was proper for "the case [to] then proceed[ ] with the plaintiff having to meet her initial burden of persuading the trier of fact by a preponderance of the evidence that the defendant unlawfully retaliated against her." *Id.* Far from requiring the trial court to direct a verdict in its favor, Asbury's evidence of a non-retaliatory reason for ending Powell's employment merely allowed it to avoid a directed verdict in the *plaintiff's* favor.

Furthermore, we must take this opportunity to make clear that retaliatory motive need not be the sole, or even primary, cause of the challenged employment action; rather, it need only be a (not "the") but-for cause of the decision. *Cf. Price Waterhouse,* 490 U.S. at 284, 109 S.Ct. 1775 (Kennedy, J., dissenting) ("Discrimination need not be the sole cause in order for liability to arise, but merely a neces-

---

5. In relevant part, KRS 344.040 provides:
 It is an unlawful employment practice for an employer:
 (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's ... sex....

sary element of the set of factors that caused the decision.").

A decision may have many causes, all of which might be believed to have played such a significant role in bringing about the decision that it would not have been made but for each of them. *See generally* W. Keeton, et al., *Prosser and Keeton on Law of Torts* 264–66 (5th ed. 1984). After all, "[t]he event without millions of causes is simply inconceivable." *Id.* at 266; *see also id.* at 265 ("[I]n a very real and practical sense, the term 'cause in fact' embraces all things which have so far contributed to the result that without them it would not have occurred."). We reiterate that "because of" does not mean "*solely* because of." *Price Waterhouse*, 490 U.S. at 241 & n.7, 109 S.Ct. 1775 (citing 110 Cong. Rec. 2728, 13837 (1964), as specifically rejecting amendment that would have placed "solely" before the words "because of").

█ And simply because the KCRA does not explicitly provide for a separate "mixed motive" claim of retaliation does not preclude plaintiffs from claiming under KRS 344.280(1) that unlawful retaliation caused an adverse employment decision when there were legitimate, non-retaliatory reasons that also arguably contributed to the employer's decision. The fact that other, non-retaliatory reasons may have contributed to an adverse employment action does not necessarily preclude recovery, so long as there is evidence sufficient to permit the factfinder to conclude that unlawful retaliatory motive was so integral to the adverse action that more likely than not the action would not have been taken had the employee not engaged in protected activity. And again, when there is conflicting evidence about the extent to which illegitimate or legitimate factors may have contributed to the adverse employment action—in other words, when the employer has put on proof of a non-retaliatory basis for the action, but the plaintiff has also submitted proof that calls into question the extent to which the employer's stated reason actually contributed to the action (i.e., evidence of at least some pretext)—that question must be answered by the jury.

Powell presented such proof, including that Provost Kulaga destroyed or deleted his notes and emails related to the investigation of the allegations against Powell and Hadlock; that Kulaga refused to allow Powell to record their meeting about the allegations or to allow her to have HR Director Hamilton present at the meeting; that Hamilton's presence at similar meetings with other employees had never before been denied; that Kulaga failed to follow an Asbury policy calling for appointment of a three-member committee to investigate the allegations; that Kulaga refused to consider Powell's proffer of emails and text messages, which she claimed refuted any allegations of inappropriate conduct or untoward relationship with Hadlock; that, according to Hamilton, the university had treated Powell differently than other coaches during its investigation by prohibiting her from speaking to her team and from attending practices or games, locking her out of her office, and banning her from campus; and that at least one of her former players directly contradicted Kulaga's ultimate findings that all fifteen members of her team agreed that her conduct had been inappropriate and that she needed to be removed as coach.

From this and other evidence presented, the jury certainly could have, and obviously did, infer that Asbury's non-retaliatory reason for ending her employment was at least to some degree pretextual. That inference, along with the *prima facie* evidence submitted by Powell, allowed the jury to conclude that her protected com-

plaining was a but-for cause of her termination. Thus, we cannot say that the jury's verdict was "palpably or flagrantly against the evidence." *Hornung*, 754 S.W.2d at 860.

In sum, whether retaliatory animus was a cause in fact of the challenged employment decision or not is best left to the trier-of-fact to resolve when, as here, there was contradictory evidence presented on the issue, which must be resolved by assessing the credibility of witnesses and the weight to be given to the evidence. *See Kwan*, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact. A jury should eventually determine whether the plaintiff has proved by a preponderance of the evidence that she did in fact complain about discrimination and that she would not have been terminated if she had not complained about discrimination.").

Accordingly, because evidence was put forth that could support a verdict in either party's favor, and because we are satisfied that the court's instructions on causation were not fatally defective, we discern no error in the trial court's denial of Asbury's motion for a directed verdict on Powell's claim of retaliation.

## C. Admission of Dr. Pritchett's testimony does not require reversal.

Next, Asbury complains about the admission at trial of the deposition testimony by Dr. Rita Pritchett, who is an Asbury alumna and had worked for the school for almost forty years, including as a professor in the Health, Physical Education, Recreation, and Athletics department; as Athletic Director for ten years in the eighties and nineties; and as head coach of both the volleyball and softball teams. The challenged testimony related to a meeting between Heather Hadlock and Provost Kulaga that Dr. Pritchett attended as Hadlock's representative. Specifically, Asbury claims that the trial court erred in allowing the following to be admitted over its objections:

> Counsel: Was there anything in—sitting there and listening to the questions and answers and based on your years of experience as a coach and athletic director—was there anything in [Hadlock's] responses that caused you concern?

> Dr. Pritchett: No.

> Counsel: And when I say "caused you concern," was there anything about her answers that made you concerned that she had been engaged in any type of inappropriate conduct with Coach Powell or any other player?

> Dr. Pritchett: No.

Asbury complains that Dr. Pritchett was thus erroneously permitted to share with the jury her opinion that Powell's conduct had been wholly innocent (contrary to Dr. Kulaga's findings on which Asbury claimed to have based its decision to end her employment).

Asbury argues that Dr. Pritchett should have been prohibited from giving such an opinion both because she had no personal knowledge of the events underlying the allegations of improper behavior between Powell and Hadlock, and instead based her testimony on hearsay alone, and because her opinion as to the appropriateness of Powell's conduct was irrelevant and improper lay-opinion testimony under KRE 701. Asbury takes further issue with the trial court's finding that Dr. Pritchett was a "quasi-expert" on the topic (apparently based on her extensive experience and familiarity with Asbury students and ath-

letes), arguing that the propriety of Powell's conduct was not a proper subject for expert testimony. And, because Powell never identified her as an expert before trial and because she did not testify at trial after the court designated her so, Asbury complains that it was not given an opportunity to cross-examine her as an expert.

We need not engage in an extensive discussion of the merits of this claim—which of course is secondary to the other issues raised by Asbury for which we accepted discretionary review—because even assuming, without deciding, that the admission of Dr. Pritchett's opinion testimony was error, it was harmless.

The objected-to testimony was only a very small snippet of Dr. Pritchett's deposition that was read to the jury, which itself constituted only a small portion of the ample testimony that was introduced over the course of the four-day trial. And it was only one piece of proof, among many, introduced by Powell to demonstrate that she had not acted inappropriately with Hadlock as the university had alleged. Further, it was not the sort of inherently weighty or scientifically authoritative opinion that might otherwise have the tendency to hold disproportionate sway over a jury. *See, e.g., United States v. Addison*, 498 F.2d 741, 744 (D.C.Cir. 1974) (" [S]cientific proof may in some instances assume a posture of mythic infallibility in the eyes of a jury of laymen . . . .").

**D. Asbury was not entitled to an employment-at-will jury instruction.**

Asbury also claims that the trial court erred to its detriment in declining to give the jury an instruction clarifying that Powell's employment was "at will" and thus could be terminated "for good cause, for no cause, or for a cause that some might view as morally indefensible," as long as it was not for an unlawful reason that is "in contravention of statutory or constitutional provisions." *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 198 (Ky. 2001). Asbury argues that such an instruction was needed to clarify for the jury that believing Asbury's decision to end Powell's employment to have been incorrect or unfair was alone insufficient to find a violation of the law. This claim has no merit.

The instructions given, as discussed above, were sufficient to convey the applicable law to the jury. They required the jury to find that Powell engaged in protected activity in complaining about perceived sex discrimination; that she had a good-faith, reasonable basis for her complaints; that she suffered adverse employment action; that Asbury officials responsible for the action against her were aware of her complaints; (unnecessarily) that her complaining about sex discrimination was a substantial and motivating factor in the adverse employment action; and that but for her complaining about sex discrimination, the adverse employment action would not have been taken. In other words, the instructions properly directed the jury to find in Powell's favor if they believed from the evidence that Asbury's retaliatory animus against Powell's protected activity was a but-for cause of the non-renewal of her employment. No more was required. That Powell was an at-will employee is no defense to illegal retaliation.

**E. Asbury was not entitled to a new trial for alleged defects in the jury's damages verdict.**

In its post-trial motion for judgment notwithstanding the verdict or, alternatively, for a new trial, Asbury argued that the jury's damages award on Powell's retaliation claim was a "quotient verdict" and thus was void. Asbury also argued that the damages award should be reversed because it was given under the improper

influence of passion or prejudice. Asbury renews both arguments on appeal, neither of which has merit.

## 1. The jury's damages award was not a "quotient verdict."

Asbury maintains that the jury's $300,000 verdict awarding damages for humiliation, embarrassment, and emotional distress on Powell's retaliation claim was void as a "quotient verdict." *See Black's Law Dictionary* (10th ed. 2014) (defining *quotient verdict* as "[a]n improper damage verdict that a jury arrives at by totaling what each juror would award and dividing by the number of jurors"). That is, Asbury argues that the jury, having been unable to agree on the proper amount of damages, settled on its verdict of $300,000 by adding the amounts each individual juror felt was appropriate and dividing that by the total number of jurors to arrive at an average sum that all could more or less be happy with.

To support this claim, Asbury submitted an affidavit from Janet Dean, an associate professor at Asbury, who was apparently contacted by a juror, her friend Susan Morgan, shortly after the verdict was rendered. According to Dean's affidavit, Morgan told her that the jury had been unable to decide on an amount of damages, so "they, or various of them,[6] wrote proposed figures anonymously on papers which were then drawn and averaged." Thus, the $300,000 amount the jury awarded Powell "was an average based upon th[is] anonymous drawing."

■ The first flaw fatal to this claim, as Powell correctly points out, is that Dean's affidavit testimony consisted solely of inadmissible hearsay. As our predecessor long ago made clear, "[e]ither direct hearsay testimony or an affidavit containing the hearsay statements of jurors in support of a motion for a new trial is inadmissible to show that a verdict was arrived at by lot." *Brown v. Commonwealth*, 490 S.W.2d 731, 732 (Ky. 1973); *see also Burton v. Commonwealth*, 309 Ky. 282, 217 S.W.2d 627, 628 (1949) (stating that the fact that a verdict was arrived at by lot "must be established by the testimony (affidavit) of a juror and may not be shown by hearsay testimony contained in an affidavit of one who was not present at the time of the occurrence"). Thus, the trial court cannot have erred in declining to find a quotient verdict and to order a new trial accordingly when Asbury produced no competent, admissible evidence to support its claim.

And there is no evidence that the jury agreed, prior to the anonymous drawing and averaging, to be bound by the results of that process. A so-called quotient verdict arises only when the jury agrees *in advance* to be bound by a verdict arrived at by averaging. *Murphy v. Cordle*, 303 Ky. 229, 197 S.W.2d 242, 244 (1946) ("[I]n the event of a prior agreement to arrive at a verdict by averaging the total amounts and thus obtaining a quotient verdict so agreed upon in advance, the verdict is void."). "[W]here there is no antecedent agreement by the jury to be bound by the resulting quotient, or, independently, it adopts an amount equal to the quotient after it is ascertained, the verdict is good." *Id.*

■ In the absence of any evidence of prior agreement by jurors to be bound by the quotient of their anonymous-drawing process, Asbury failed to show that the jury's damages award was in fact an improper quotient verdict.

## 2. The damages award was not the result of improper passion or prejudice.

---

6. Morgan apparently told Dean that she "recused" herself from this process.

Asbury also renews its attack on the jury's damages verdict on the alleged basis that it was the product of undue passion or prejudice. Because KRS 344.450 [7] allows for only compensatory, and not punitive, damages awards, *Ky. Dept. of Corrections v. McCullough*, 123 S.W.3d 130, 137–38 (Ky. 2003), Asbury argues that the $300,000 in damages awarded for humiliation, embarrassment, and emotional distress, is excessive given an alleged lack of evidence that Powell experienced such injuries as "naturally and directly resulting" from Asbury's unlawful retaliation, *id.* at 138. Thus, according to Asbury, the verdict can only be explained by improper jury passion or prejudice.

Civil Rule 59.01 provides that a trial court may grant a new trial for, among other things, "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice or in disregard of the evidence or the instructions of the court." CR 59.01(d). Whether to grant or deny a new trial for an allegedly excessive verdict lies within the discretion of the trial court, *Childers Oil Co., Inc. v. Adkins*, 256 S.W.3d 19, 28 (Ky. 2008). However, "[t]he amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because [the court] would have reached a different conclusion." *Id.* (quoting *Hazelwood v. Beauchamp*, 766 S.W.2d 439, 440 (Ky. App. 1989)). Instead, "their decision should be disturbed only in the most egregious circumstances." *Id.* Courts must refrain from disturbing the jury's assessment of damages "[i]f the verdict bears any relationship to the evidence of loss suffered." *Id.* And "[o]nce the issue [of excessive damages] is squarely presented to the trial judge, who heard and considered the evidence," a reviewing court on appeal cannot "substitute [its] judgment on excessiveness for [the trial judge's] unless clearly erroneous." *Davis v. Graviss*, 672 S.W.2d 928, 933 (Ky. 1984).

With these standards in mind, we must reject Asbury's plea to overturn, the jury's verdict. First, as the trial court found, Provost Kulaga's investigation findings and decision to end Powell's employment based on apparently untrue allegations, or at least insinuations, of Powell having been in a lesbian relationship with her assistant coach could certainly have resulted in significant emotional turmoil for her, considering Asbury's Christian affiliation, if such conduct is contrary to her religious belief. And there was evidence that Powell experienced substantial stress during the more than two years she spent struggling to find other employment following her termination, which the trial court also believed strongly affected the jury's consideration of the emotional harm flowing from Asbury's unlawful retaliation.

The jury also heard testimony from those who were close to Powell when the allegations were leveled, and following her discharge about their perceptions of the great emotional strife she experienced during that time. And Powell's strong ties to Asbury—she was a 1993 graduate after having played several sports, and her grandfather, mother, father, and brother were also Asbury alumni—likely played a part, by adding context to the emotional consequences of Asbury's retaliation, in the jury's determination as well.

---

7. KRS 344.450 provides:

Any person injured by any act in violation of the provisions of this chapter shall have a civil cause of action in Circuit Court to enjoin further violations, and to recover the actual damages sustained, together with the costs of the law suit. The court's order or judgment shall include a reasonable fee for the plaintiff s attorney of record and any other remedies contained in this chapter.

The trial judge's finding that the jury's verdict was not excessive in reliance on this and other evidence introduced at trial was not clearly erroneous. The evidence purportedly showing passion or prejudice that Asbury emphasizes—that, during deliberations, the jury asked the trial court whether it could require Asbury to pay Powell's attorneys' fees as part of its damages award; and that Juror Morgan reportedly told Dean that most of those in Asbury's administration should have been fired for what they did to Powell and that "she really identified with Ms. Powell and wept for her several times during the trial," (which, again, was inadmissible hearsay testimony and improper to use to attack the verdict)—does not make this any less so.

### F. The award of attorneys' fees and costs was not unreasonable.

Asbury's final claim urges reversal of the award of Powell's attorneys' fees and costs and is twofold. First, Asbury argues that because the KCRA only allows for the prevailing party's reasonable attorneys' fees and costs incurred to be awarded in addition to damages, *see* KRS 344.450, the award must be overturned because the jury's verdict in Powell's favor must be overturned (for the claimed legal and evidentiary errors discussed above). This argument is obviously moot given this Court's rejection of each of Asbury's arguments for reversal of the retaliation verdict.

Second, Asbury maintains that the trial court's award of fees and costs totaling $220,500 is unreasonably excessive. Following the trial, Powell filed a motion for attorneys' fees and costs, requesting a total of $284,400 in fees ($253,350 for co-counsel Debra Ann Doss plus $31,050 for co-counsel Brian Daley) and $9,737.29 in costs incurred. In support of her motion, Powell submitted affidavits from Doss and Daley with time sheets representing that they spent 844.5 hours and 103.5 hours, respectively, on this case during its more than three years in litigation. The total requested fee was calculated based upon an hourly rate of $300 for both attorneys.

Powell also submitted with her motion the affidavits of two other local civil rights lawyers to substantiate the reasonableness of her requested fee. After holding a hearing, the trial judge ultimately adjusted downward Doss's and Daley's hours by (roughly) [8] 20% and applied the requested $300 hourly rate to Doss while reducing Daley's to $150 per hour. Thus, the trial court awarded Doss $200,000; Daley $12,500; and costs of $8,000 (which, presumably, was also a result of the trial court's approximate 20% reduction of the requested total).

As the trial judge recognized, the so-called "lodestar" method is the appropriate means for assessing a reasonable attorney's fee award in civil rights cases. That is, "the attorney's fee awarded should consist of the product of counsel's reasonable hours, multiplied by a reasonable hourly rate, which provides a 'lodestar' figure, which may then be adjusted to account for various special factors in the litigation." *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 826 (Ky. 1992) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). In adjusting the lodestar figure to arrive at a reasonable award, the trial court must make "a true effort to place a value on the

---

8. To arrive at Doss's total fee of $200,000, the trial court actually reduced her hours by about 21.06% (844.5 - .2106 * 844.5 = 666.66 (repeating) * $300 = $200,000). Daley's hours, on the other hand, were reduced by approximately 19.485% (103.5 - .19485 * 103.5 = 80.515 * $150 = $12,500).

services rendered by the attorneys to vindicate the civil rights violations." *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 429 (Ky. 2010). We review the reasonableness of an award of attorney's fees for abuse of discretion. *Banker v. Univ. of Louisville Athletic Ass'n, Inc.*, 466 S.W.3d 456, 465 (Ky. 2015).

The only arguments raised by Asbury against the reasonableness of the award of fees are that it is excessive given that Asbury successfully defended against two out of three of Powell's claims against them (gender discrimination and defamation) and that, according to Asbury, co-counsel Brian Daley did not actively participate in the litigation of Powell's case and, accordingly, should not have been awarded any fees at all. However, Asbury does not cite any case law or otherwise make any legal arguments in support of these bald claims. In any event, neither of the aforementioned grounds enables this Court to conclude that the amount awarded by the trial court was unreasonable or an abuse of discretion.

In sum, we are convinced that the fee award represents a considered and reasonable assessment by the trial court of the value of the services rendered by each of Powell's attorneys to prevail on her retaliation claim. Asbury has failed to show any abuse of discretion in that assessment.

### III. Conclusion

Because retaliation claims under KRS 344.280(1) require an employee's protected activity be a but-for cause of an adverse employment action but do not require an actual underlying violation of the KCRA, because the jury instructions in this case were substantially accurate statements of the law in requiring the jury to find but-for causation, and because none of Asbury's other claims of error require reversal, the judgment of the Court of Appeals,

affirming the Jessamine Circuit Court is likewise affirmed.

All sitting. All concur.