RENDERED:  DECEMBER 17, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1578-MR

JACOB ASHBY                                                              APPELLANT

v.              APPEAL FROM HENDERSON CIRCUIT COURT
HONORABLE KAREN LYNN WILSON, JUDGE
ACTION NO. 19-CI-00493

ED BRADY,
HENDERSON COUNTY SHERIFF                                         APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, MAZE, AND McNEILL, JUDGES.

MAZE, JUDGE:  Jacob Ashby appeals from a summary judgment entered by the

Henderson Circuit Court on his disability discrimination and retaliation claims

against Ed Brady, Henderson County Sheriff (Sheriff Brady).  He argues that there

were genuine issues of material fact which should have precluded summary

judgment on these claims.  However, we agree with the trial court that Ashby

failed to establish a *prima facie* case for disability discrimination or retaliation. Hence, we affirm.

In January 2017, the Henderson County Sheriff's Office (HCSO) hired Ashby as a deputy sheriff. When he was hired, Ashby advised the HCSO of his medical history, which included a motorcycle accident on May 8, 2011. As a result of the accident, Ashby suffered skull fractures and a subdural hematoma. Later in 2011 and in 2012, Ashby suffered seizures, which were attributed to sleep deprivation and heat exhaustion.

Ashby graduated from the police academy in August 2017 and began his work as a deputy sheriff. Shortly after completing his training, Ashby experienced a brief loss of consciousness while off-duty. He did not report this episode to HCSO.

On October 11, 2018, Ashby crashed his police cruiser while on duty. He filed an incident report with Sheriff Brady, explaining the cause of the accident as falling asleep at the wheel.[1] Footage from his cruiser dash camera and body camera showed that he lost consciousness for over five minutes.

---

[1] Ashby initially told the responding HCSO deputies that he had lost control of his cruiser after swerving to avoid a deer. At the emergency room, he told physicians he had fallen asleep due to sleep deprivation.

Sheriff Brady restricted Ashby's duties until he could be seen by a doctor, preferably a neurologist. On October 25, 2018, Ashby went to see neurosurgeon Dr. Blaine Lisner. Dr. Lisner performed a neurological scan, the results of which were normal. Based on these results and Ashby's self-reported history, Dr. Lisner concluded that Ashby had not suffered a seizure. Rather, Dr. Lisner diagnosed Ashby with a concussion and released him to work without restriction.

At the HSCO's request, Ashby want to see another neurologist, Dr. Satish Shah, on November 8, 2018. Based on Ashby's medical history, Dr. Shah also suspected that Ashby suffered a sleep deprivation-induced seizure. Dr. Shah ordered an EEG, the results of which were abnormal. He prescribed Keppra (an anti-seizure medication) and placed Ashby on work restrictions. Those restrictions included no driving for ninety days after the incident, no climbing unprotected heights, no operation of heavy machinery, and "common sense" precautions.

Ashby began driving after the ninety-day period, but he remained subject to the other restrictions. In March of 2019, Ashby asked for a fixed day shift. HCSO declined the requested because it assigned shifts based on seniority. Ashby continued to work his assigned schedule.

On June 25, 2019, Ashby attended firearm training beginning at 8:00 a.m. This was only two hours after his eight-hour night shift had ended. Ashby

had the option of attending a session at noon, but he chose to go to the morning session because it would allow him to catch up on sleep that afternoon. During the training session, Ashby fell and experienced a seizure that lasted several minutes. He admitted that he missed his morning dose of Keppra that day. The emergency room physician cleared Ashby to return to work the next day.

On June 27, 2019, Ashby went to see Dr. Shah. Dr. Shah concluded that it was "very likely Ashby had suffered a sleep deprivation induced seizure." He increased Ashby's dose of Keppra. Dr. Shah also recommended that Ashby get adequate sleep, and work only a fixed daytime schedule.

Ashby provided this recommendation to the HCSO and again requested a fixed day shift. Sheriff Brady advised Ashby that he could not accommodate the request. Instead, Sheriff Brady gave Ashby written notice that he was being discharged because Ashby's repeated loss of consciousness prevented him from performing the essential and required duties of a deputy sheriff. The notice also stated that Ashby would be re-hired if he offered proof that his medical condition was "in complete remission."

On October 2, 2019, Ashby again went to Dr. Shah. Ashby reported that he had not had any seizure-like activity since the incident on the firing range in June. Dr. Shah concluded that Ashby could do sedentary work but noted that it was difficult to predict when he could have another episode. On November 8,

2019, Dr. Shah wrote a letter stating that Ashby was able to return to work, subject to the previous restrictions except driving or operating heavy machinery. Ashby has remained under these restrictions since that time.

Ashby filed his complaint against Sheriff Brady in September 2019. He alleged that Sheriff Brady's actions constituted disability discrimination in violation of KRS[2] 344.040, and retaliation for having requested an accommodation in violation of KRS 344.280.[3] Following a period of discovery, Sheriff Brady moved for summary judgment, arguing that Ashby failed to establish a *prima facie* case of disability discrimination or retaliation.

After considering the record and arguments of counsel, the trial court granted the motion. The court found that Ashby failed to show he is otherwise qualified to perform the essential functions of a deputy sheriff, either with or without accommodation. Given his repeated instances of losing consciousness, the court found no evidence that an accommodation would allow Ashby to perform his duties without any threat of safety to himself or others. In the alternative, the court found no evidence that Sheriff Brady's proffered reasons for terminating Ashby and for declining his request for accommodation were false or pretextual. And

---

[2] Kentucky Revised Statutes.

[3] Ashby's complaint also alleged retaliation for having filed a workers' compensation claim, in violation of KRS 342.197. But following discovery, he agreed to dismiss this claim.

finally, the trial court found no causal connection between Ashby's request for an accommodation and his termination. Therefore, the trial court dismissed both claims. Subsequently, the trial court denied Ashby's motion to alter, amend, or vacate the summary judgment order. Ashby now appeals.

The sole question presented on appeal is whether Sheriff Brady was entitled to summary judgment as a matter of law. "[T]he proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[4] 56.03. The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor. *Steelvest*, 807 S.W.2d at 480. The trial court must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. *Id.* Since a summary judgment involves no fact-finding, this Court's review is *de novo*, in the

---

[4] Kentucky Rules of Civil Procedure.

sense that we owe no deference to the conclusions of the trial court. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996).

The scope of our review is further defined by the elements necessary to establish a *prima facie* case under the Kentucky Civil Rights Act (KCRA). KRS 344.010 *et. seq.* In pertinent part, KRS 344.040(1) provides that it is unlawful for an employer to discharge or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because the person is a "qualified individual with a disability." The plaintiff bears the initial burden of establishing a *prima facie* case of disability discrimination against the defendant. *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004). To establish a *prima facie* case of discrimination based on a disability, the plaintiff must show: (1) that he had a disability as that term is used under the statute; (2) that he was "otherwise qualified" to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability. *Id*.

KRS 344.010(4) defines "disability" to mean:

(a) A physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual;

(b) A record of such an impairment; or

(c) Being regarded as having such an impairment.

-7-

*See also* 42 U.S.C.[5] § 12102(2).  Whether the plaintiff has an impairment and whether the conduct affected by the impairment is a major life activity under the statute are legal questions.  *Hallahan*, 138 S.W.3d at 707.  The ultimate determination of whether the impairment substantially limits the major life activity generally is a factual issue for the jury, but it may be resolved upon summary judgment under the appropriate circumstances.  *Id.*

As an initial matter, Ashby disputes whether his condition is actually a seizure disorder.  Ashby points to Dr. Lisner's initial conclusion that he suffered a concussion from the vehicle accident but had no permanent neurological trauma.  Ashby also maintains that his episodes were caused by lack of sleep and possibly a side effect of the Keppra medication.  Ashby also notes Dr. Shah's initial conclusion that he did not suffer a seizure during the vehicle accident.

But in disputing the cause of his loss of consciousness, Ashby undermines the first element of his *prima facie* case.  Merely having an impairment does not demonstrate that the impairment limits a major life activity.  *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195, 122 S. Ct. 681, 690, 151 L. Ed. 2d 615 (2002), *superseded by legislative action*, U.S. Pub. L. 110-325 (2009).  If Ashby's condition is not a "physical or mental impairment that

---

[5] United States Code.  The KCRA's disability provisions incorporate the definitions under the Federal "Americans with Disabilities Act" (ADA), 42 U.S.C. §§ 12101 *et seq*.

substantially limits one (1) or more of [his] major life activities[,]" then he does not have an actionable disability within the meaning of the KCRA. KRS 344.010(4)(a).

However, the trial court presumed, for summary judgment purposes, that Ashby's condition constitutes a disability within the meaning of the KCRA. While Ashby's argument somewhat undermines this presumption, neither party has challenged this conclusion on appeal. Rather, the question on appeal involves the second element of his *prima facie* case – whether Ashby was "otherwise qualified" to perform the requirements of his position as a deputy sheriff, either with or without reasonable accommodation.

Ashby takes the position that there are genuine issues of material facts whether he is capable of performing the requirements of his position, particularly if he is allowed a reasonable accommodation. In contrast, Sheriff Brady argued, and the trial court agreed, that the risk of an unexpected seizure would make Ashby's employment with the HCSO a "direct threat" to his own safety, the safety of his colleagues, and the safety of the public at large. The trial court further found that, "even if Ashby had a fixed shift, [HCSO] cannot control all the multiple other factors which may lead to Ashby's having another seizure, such as heat, dehydration, and his remembering to take his medication or get enough sleep."

In reaching this conclusion, the trial court applied the analysis set out in *Coleman v. Pennsylvania State Police*, 561 F. App'x 138 (3d Cir. 2014), a factually similar case. Coleman, a probationary state trooper, experienced recurrent seizures caused by a work-related automobile accident. *Id.* at 140. Despite treatment and medication, Coleman continued to experience seizures. As a result, the Pennsylvania State Police (PSP) placed Coleman on limited-duty assignment until he remained "seizure-free" for at least five years. *Id.* at 141. Ultimately, the PSP terminated Coleman due to the lack of limited-duty assignments for the requisite period. *Id.*

Coleman brought suit against the state police under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); the ADA, 42 U.S.C. § 12133; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. The federal district court granted the PSP's motion for summary judgment, finding, among other things, that there were no genuine issues of material fact whether: (1) Coleman was otherwise qualified to perform the essential functions of a PSP full status trooper; and (2) whether the PSP could have made reasonable accommodations that would have allowed him to perform those essential functions. *Coleman*, 561 F. App'x at 142.

As in the current case, Coleman argued that there were genuine issues of material fact whether he could perform the essential functions of his job with reasonable accommodations. The Third Circuit disagreed, noting that,

an employer may assert a defense to a charge of discrimination by showing that a contested qualification standard is "consistent with business necessity" or that it prevents an individual from posing "a direct threat to the health or safety" of others in the workplace. 42 U.S.C. § 12113(b)-(c). In the context of regulations governing law enforcement officers, courts have found that "employers do not violate the ADA by ensuring that officers are . . . fit for duty." *Davis-Durnil v. Vill. of Carpentersville*, 128 F.Supp.2d 575, 580 (N.D. Ill. 2001); *see also Maull v. Div. of State Police, Dep't of Pub. Safety, State of Delaware*, 141 F.Supp.2d 463, 474 (D. Del. 2001) ("[C]ourts have also recognized a distinction when the employee is a law enforcement officer. The ADA permits employers to consider whether an individual poses a direct threat . . . when considering whether an employee is qualified, and in the case of police officers, ensuring public health and safety is the sine qu[a] non of their job."); *Ethridge v. Alabama*, 860 F. Supp. 808, 816 (M.D. Ala. 1994) (finding that shooting in a specified stance is an "essential function" that must be performed by police officers).

*Id.* at 144 (footnotes omitted).

The Third Circuit concluded that the PSP's seizure protocol was consistent with the "essential function" test because it appropriately addressed the issue of whether the trooper's employment would pose a "direct threat." Since the medical evidence established that Coleman remained at risk of another seizure, the court found that the PSP explained that this risk was significant enough to constitute a "direct threat" and that the seizure protocol was a justified response to that threat. *Id.* at 145.

-11-

Ashby points out that the "direct threat" exemption is codified in the United States Code and the Code of Federal Regulations, but it does not have any analogue in Kentucky statutes. However, the KCRA was modeled after federal law, and our courts have interpreted the Kentucky Act consistently with the corresponding federal enactments. *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003). Furthermore, the ADA requires the same *prima facie* showing as the KCRA requires in disability discrimination cases.

Ashby further argues that the "direct threat" framework is not applicable to his case. He points out that, unlike the PSP, the HCSO has not adopted a seizure protocol governing all employees in his position. Instead, Sheriff Brady merely made an *ad hoc* assessment that Ashby's condition posed a threat to the performance of his duties. Ashby further notes that neither Dr. Lisner nor Dr. Shah diagnosed him with a seizure disorder. And both physicians have cleared him to return to work, subject only to limited restrictions.

Finally, Ashby states that no physician has directly opined that his work as a sheriff's deputy would create a significant risk of harm to himself, his co-workers, or to the public at large. Rather, Sheriff Brady based his decision upon his own assessment of Ashby's condition. Consequently, Ashby argues that the trial court erred in finding that he was unable to safely perform the essential requirements of his position without posing a risk of harm to himself or others.

The trial court recognized that these factors distinguish Ashby's situation from the facts in *Coleman*. However, the court noted that Sheriff Brady was not relying solely on his own opinion; he was basing his assessment on the restrictions imposed by Dr. Shah. In addition, HCSO personnel observed Ashby suffer an apparent seizure on the firing range, and this was consistent with his loss of consciousness during the automobile accident. In fact, Dr. Shah diagnosed the firing-range incident as a seizure, and he had previously prescribed an anti-seizure medication. In addition, Ashby remains under most of the restrictions imposed by Dr. Shah.

Even if the "direct threat" framework of *Coleman* is not applicable to a disability discrimination claim under the KCRA, we agree with the trial court that Ashby failed to establish the second element of his *prima facie* case. Ashby's diagnosis and prognosis are not as clear as the trooper in *Coleman*. Nevertheless, Ashby remains under significant work restrictions. At the time of his termination, he could not climb heights unattended, swim unattended, or operate heavy machinery.

Sheriff Brady testified that these restrictions could prevent Ashby from performing the essential functions of his position. Dr. Shah also stated that it would be "difficult to predict" whether Ashby could have another episode, and that many factors, not just lack of sleep, could trigger another episode. Therefore, we

-13-

agree with the trial court that Ashby failed to establish that he was "otherwise qualified" to perform the job duties of a deputy sheriff, either with or without reasonable accommodation. And since Ashby failed to establish this element of his *prima facie* case, the issues relating to the pretext analysis are moot. Consequently, the trial court properly granted summary judgment for Sheriff Brady on this claim.

Ashby also contends that Sheriff Brady retaliated against him for requesting an accommodation of a fixed day shift. KRS 344.280(1) makes it unlawful for a person:

> To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter.

*See also Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 580 (Ky. 2016).

A plaintiff does not necessarily need prove an underlying violation of the KCRA to sustain a retaliation claim under KRS 344.280(1). *Asbury Univ. v. Powell*, 486 S.W.3d 246, 252 (Ky. 2016). Rather, all that is required to obtain retaliation protection under KRS 344.280(1) is that: (1) the employee have "a reasonable and good faith belief" that the adverse employment practices he opposed were KCRA violations, *id.*; and (2) the adverse employment action would not have occurred but for the protected conduct. *Id.* at 256.

-14-

In the current case, Sheriff Brady did not terminate Ashby when he requested a fixed day shift in March 2019. In fact, Ashby continued to work his regular schedule until the July 2019 incident on the firing range. Rather, Sheriff Brady terminated Ashby following the firing range incident and after determining the HCSO could not accommodate Dr. Shah's recommendation of a fixed day schedule.

Even if this were sufficient to establish a causal connection between Ashby's request for an accommodation and the adverse employment action, Ashby must also show that his request was a "substantial and motivating factor" for the decision to terminate him. *Powell*, 486 S.W.3d at 256. As discussed above, Sheriff Brady presented definitive evidence that the requested accommodation was not reasonable because it assigned duty shifts based on seniority. Furthermore, Ashby remained unable to perform the essential functions of his job even with the proposed accommodation. As a result, the trial court properly granted summary judgment on the retaliation claim.

Accordingly, we affirm the summary judgment entered by the Henderson Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:                    BRIEF FOR APPELLEE:

John S. Phillips                         J. Christopher Hopgood
Abigail V. Lewis                         Davis L. Hunter
Louisville, Kentucky                     Henderson, Kentucky